# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 18, 2011 Session

## STATE OF TENNESSEE v. KELLEY ELIZABETH CANNON

**Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2809      Cheryl A. Blackburn, Judge**

**No. M2010-01553-CCA-R3-CD - Filed October 30, 2012**

After a trial by jury, the defendant was found guilty of the first degree (premeditated) murder of her spouse and was sentenced to life in prison. On appeal, the defendant raises numerous challenges to her conviction, claiming that: (1) the evidence used to convict her was insufficient, (2) the trial court erred by failing to suppress certain evidence found by the police during a warrantless search of the residence that she formerly shared with the victim, (3) the trial court erred by admitting certain expert testimony, (4) the trial court erred by failing to suppress certain statements she made to police, (5) the trial court erred by admitting evidence relating to a prior domestic disturbance between the defendant and the victim, and (6) the trial court erred by failing to grant a mistrial. After carefully reviewing the record and the arguments of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JEFFREY S. BIVINS, J., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Kelley Elizabeth Cannon.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Tory) Johnson, III, District Attorney General; Katrin N. Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS AND PROCEDURAL HISTORY

On September 2, 2008, the defendant, Kelley Elizabeth Cannon, was indicted for the first degree murder of James Cannon, her husband, in violation of Tennessee Code Annotated section 39-13-202 (2008). Prior to her trial, the defendant filed a motion to suppress two statements that she had given to police and a motion to suppress evidence seized during three police searches of the crime scene – the defendant's former marital residence. The trial court denied these motions following a hearing. The defendant also filed a motion *in limine* concerning certain anticipated testimony regarding a prior domestic dispute between the defendant and the victim, and a motion challenging the admissibility of certain expert testimony. The trial court also denied these motions.

At the defendant's trial on April 26-29, 2010, the State presented the following evidence:

The first witness for the State was the son of the defendant and the victim, who testified that he was born on September 16, 1990, and was eleven years old at the time of trial. He testified that he had one younger brother and one younger sister. He testified that after his mother had moved out of the former martial home, only he, his two siblings, and his father (the victim) still lived in the residence. He testified that after his mother moved out of the house, he and his brother started sleeping in their parent's former bedroom, and his dad would sleep either in his office or in the boys' former bedroom.

The witness testified that on the night of the incident he had fallen asleep, along with his brother, in his parent's former bedroom. He testified that sometime after he fell asleep that night, his mother woke him up and told him "we just have to go." He testified that he asked his mother if he could get a pillow from his former bedroom, but his mother told him "no." When he was awakened, he realized that his brother and sister were already ready to leave. He believed the time was between 1:00 a.m. and 2:00 a.m. He testified that his mother would normally come before 9:00 p.m. when she wanted to pick up the children.

The victim's son testified that when they were leaving, the defendant led all of them down the front set of stairs, rather than down the more convenient back set of stairs near his former bedroom where his father had fallen asleep. He testified that he did not enter or retrieve anything from his former bedroom before they left, including any clothes. He testified that the defendant seemed "nervous and like jumpy" when she woke him, and because of this, he felt scared and was confused as to why she was there. The witness testified that after they left the former marital residence, the defendant took all three children to the apartment where she had been living. The witness testified that the defendant did not talk to them at any point during the car ride. He also testified that the defendant did not make

-2-

any phone calls or do anything else before she went to sleep after they arrived at her place.

The witness testified that the following morning, they had been watching cartoons for a few hours when the police knocked on the door. He testified that he assumed that his dad had sent the police to find them. He testified that the defendant talked to the police for a while and that he and his siblings were placed into a patrol car afterward.

The witness testified that before the night of the incident, the defendant and the victim had gotten into a "big fight," and the defendant had chased after the victim with a knife in an effort to prevent him from calling the police. The witness testified that the defendant eventually caught the victim, knocked him to the ground, and succeeded in taking the battery out of the his cell phone, but the victim had already called the police. The witness clarified that he had seen the victim push the defendant all the way to the ground on that occasion. The witness testified that following this confrontation, the defendant went back into the marital residence, retrieved his younger sister, got into her vehicle, smashed into the back of the victim's car, and drove away with the police in pursuit.

On cross-examination, defense counsel questioned the witness concerning a prior statement he had given to police in which he had not mentioned asking to get a pillow on the night of the incident. The witness testified that he remembered that he wanted to retrieve a pillow from his former bedroom because he knew that the defendant's pillows did not "give any cushion to your head." The witness also clarified that he could not be entirely sure where his father had slept on the night in question because he had gone to bed before his father, but he testified that his father had told him that he was going to sleep in the boys' former bedroom that evening. The witness testified that he had informed other individuals that his mom "looked nervous and jumpy" prior to his recent testimony and explained to them that she appeared this way "because she was on drugs and stuff." The witness testified that he could not remember watching any television at the defendant's apartment before he went to sleep on the night of the incident, and he could not remember precisely where he and his siblings had slept. The witness claimed that his memory of these events was "fuzzy" because he had been really scared at the time.

Ms. Vicky Shams, the victim's housekeeper, testified that she had been hired by the defendant and that she had been working for the family for approximately six weeks by the time of the incident. She testified that soon after the defendant hired her, the defendant moved out of the house and she never saw the defendant again. She testified that on June 23, 2008, she arrived at the victim's house at 8:30 a.m., as was her usual practice. She testified that when she tried to let herself into the house with her key, she discovered that the front door was unlocked. After entering the residence, she also noticed several other unusual things – including the fact that the back door was open, numerous items in the house were

out of place, the children did not appear to be awake, and there was no sign of the victim, even though he normally left for work at 9:00 a.m.

Ms. Shams testified that the victim also employed two nannies, which he had hired after the defendant moved out. Ms. Shams testified that at least one of these nannies, and sometimes both, would arrive each morning. She testified that soon after she arrived on June 23, 2008, one of those nannies, Ms. Karley Dewey, also arrived. Ms. Shams testified that soon thereafter she went upstairs to check on the victim's youngest child – an eighteen-month-old toddler who should have been awake by that time – and that she discovered that she was not in her crib and that the other children were gone as well. She testified that a number of things upstairs appeared out of place. She testified that she saw a wine glass and an overturned trash can in the master bathroom, a chest of drawers out of place in the children's bedroom, and a bloody towel beside one of the beds. She testified that she took the bloody towel downstairs with the rest of the dirty clothes and started washing it in the washing machine. She testified that she placed the wine glass, which appeared to have once contained red wine, in the kitchen sink. She testified that she informed the nanny that no one was at home, and the two had a discussion after which they eventually decided that one of the children must have gotten hurt and been taken to a hospital.

Ms. Shams testified that she asked the nanny to follow her upstairs to help her return the chest of drawers to its normal location. She testified that the chest of drawers in the boys' bedroom had been placed against the bedroom closet with its drawers facing the closet door. She testified that the two of them moved the chest of drawers, and then she opened the closet door. She saw the victim lying on the floor inside. She testified that his skin was dark and his hands appeared to be the color of charcoal. She testified that she immediately slammed the door and asked for the nanny to call 911. A short time later, she opened up the closet door again to make sure that the victim was not merely unconscious. She confirmed that he was deceased. She testified that she could detect the strong smell of bleach coming from the closet, and there was a bleach bottle lying on the closet floor.

Ms. Shams testified that emergency medical personnel arrived shortly thereafter. She testified that she asked the nanny to call the victim's mother-in-law (the defendant's mother), whom she had met previously. She testified that the nanny did so and handed her the phone. She testified that she informed the victim's mother-in-law that the victim was dead. She testified that she was shocked by the victim's mother-in-law's response. She testified that the victim's mother-in-law's response indicated that she already knew that the victim was dead. Following this testimony, Ms. Shams identified several photographs taken of the crime scene, and these were authenticated and entered into evidence.

On cross-examination, defense counsel questioned Ms. Shams concerning a statement

-4-

she had given to detectives the day following the murder. In this statement, Ms. Shams told the police that when she arrived on the day of the murder, the house appeared as though it had been completely unattended for the last three days and that she had discovered many alcohol bottles in a brown paper bag downstairs. Ms. Shams testified that finding these alcohol bottles struck her as unusual because there was "already plenty of alcohol" in the home. Ms. Shams testified that she remembered telling the detective that she had thought that the victim might have been highly intoxicated the night before and that he had perhaps been so for the entire weekend. Ms. Shams testified that during the time she worked for the victim she had seen him drink every day, but she had never seen him drink more than one drink per day.

Ms. Shams testified that she put the wine glass she discovered that day in the kitchen sink because she intended to wash it but that she gave it to police before she did so. Ms. Shams testified that she told the police that she initially thought that the victim might have knocked over a dresser upstairs because he had been drinking and had become upset with the children. Ms. Shams testified that she initially told the police that she did not believe that the victim had actually slept in the boys' bedroom the night before because it was his habit to take the lamps off the nearby dresser and put them down on the bunk bed with him when he did so. She testified that when she entered the boy's bedroom, she did not see those lamps in the bunk bed, and consequently she did not believe initially that the defendant had slept there the prior evening. Ms. Shams also testified that she stopped the nanny from calling 911 for a brief period of time so she could check on the victim, because she thought that the victim might have been drinking and had just passed out, and she did not want to embarrass the victim if this had occurred. On redirect examination, Ms. Shams testified that she had never seen the victim become intoxicated, and she had never seen him drink more than one drink per day.

Mr. John Hollins, Jr., testified that he was a lawyer who specialized in domestic relations and divorce and that he represented the victim. Mr. Hollins testified that the victim contacted him in February of 2008 concerning getting a divorce from the defendant. Mr. Hollins testified that on February 29, 2008, the victim met with him in his office and gave him the information that formed the basis of the divorce complaint, which he filed the same day. In conjunction with this divorce action, Mr. Hollins testified that he filed a request to have the victim receive temporary custody of the three children, which was granted. Mr. Hollins also testified that he requested a restraining order against the defendant preventing her from threatening the victim, harassing him, or harming him in any way, and the judge granted that order as well. Mr. Hollins testified that the judge's order also prevented the defendant from using or abusing any narcotic medication, alcohol, or drugs in any way.

Mr. Hollins testified that he also requested the judge to issue a restraining order giving

the victim exclusive possession of the parties' former marital home, so that the victim and the children could live at the former marital residence by themselves. Mr. Hollins testified that the judge did not grant that request at the time, and it was his belief that the judge had not done so because that type of relief had to be sought through a temporary injunction rather than a restraining order. Mr. Hollins testified that he filed a motion for a temporary injunction for the same purpose on March 3, 2008, which included additional information about the history of events that had occurred between the parties. He testified that the judge granted the victim's request for an injunction on March 4, 2008, giving the victim exclusive possession of the former marital residence and preventing the defendant from coming to the house or interfering with the victim's possession of the house in any way. Mr. Hollins testified that all these orders were still in effect at the time of the victim's death.

Mr. Hollins testified that he received a phone call from the victim on May 22, 2008, concerning an incident of domestic violence that had occurred the previous evening. Mr. Hollins testified that he advised the victim that he should file a new application for a restraining order, this time in criminal court, stating that he was the victim of domestic violence. He testified that the victim sought and received an *ex parte* order of protection on May 22, 2008, from the criminal court. He testified that the requisite hearing concerning this *ex parte* order of protection was delayed on one occasion while the defendant sought to obtain new representation, and, as a consequence, the *ex parte* order was still in effect at the time of the victim's death.

Mr. Hollins testified that he received a phone call from the victim's mother-in-law just before lunch on Monday, June 23, 2008, informing him that the victim was dead. He testified that a police officer then got on the phone and asked him to bring any relevant court documents to the crime scene and that he did so.

On cross-examination, Mr. Hollins testified that he was aware that the victim was a lawyer, but he was unaware that the victim had previously done some divorce work. Mr. Hollins testified that he was aware that the victim had transferred all of his interest in the former marital home to the defendant by quitclaim deed in October of 2005. Mr. Hollins explained that the victim had done so for bankruptcy and estate planning purposes, but he acknowledged that at the time of the victim's death the defendant was the sole title owner of record of the former marital residence.

Mr. Hollins testified that he was not aware that the defendant had consulted with a divorce lawyer as early as October of 2007, and he was unaware that the defendant had made allegations of marital infidelity concerning the victim. Mr. Hollins testified that among the various allegations that he had made when he had requested a temporary injunction from the divorce court were allegations that (1) on March 6, 2008, the defendant had "collapsed in the

lobby of the Loews Vanderbilt Plaza," (2) on that occasion, she had to be rushed by ambulance to a hospital, where she was given intravenous fluids, and (3) when all this occurred, the defendant weighed approximately ninety pounds.

Mr. Hollins testified that in the days following the filing of the divorce action there was an informal agreement struck between the defendant and the victim. Pursuant to this agreement, if the defendant would enter into drug and alcohol treatment, the victim would consider letting her back into the marital home. Mr. Hollins testified that despite this informal understanding, they did not seek to change any of the court orders because it was his desire to have a sixty-day trial period to determine whether the treatment that the defendant received was going to be effective. Mr. Hollins testified that had the defendant's treatment proven effective, he would have gone to court and sought to have the orders changed, retroactive to the date that the defendant had entered treatment. However, Mr. Hollins testified that they never got through the informal sixty-day trial period. Mr. Hollins testified that although the defendant was represented by two lawyers with respect to the divorce action, neither lawyer ever filed an answer to the original divorce complaint or any other responsive pleadings to the victim's requests for *ex parte* and other forms of injunctive relief.

Mr. Hollins testified that the defendant checked herself into Cumberland Heights Rehabilitation Center on March 6, 2008, for treatment and that she was released in early April of 2008. Mr. Hollins testified that the defendant was initially welcomed back into the marital home following her release. Mr. Hollins testified that when the defendant returned to the former marital home, the restraining orders that had been put into place by the divorce court were still in effect. Mr. Hollins testified that on May 21, 2008, the victim complained to him concerning an incident of domestic violence involving the defendant that had resulted in the defendant's arrest. Mr. Hollins testified that he advised the victim to request an *ex parte* order of protection from the criminal court, which he did, and once this protective order was granted, the defendant was not allowed to return to the former marital home. Mr. Hollins testified that in the weeks after the defendant was released from jail, there was an extended period of time when no one – even the defendant's lawyers – knew where she could be located. The defendant did not answer phone calls or text messages during this time period. Mr. Hollins testified that after a few weeks the defendant was eventually located, and the victim got her an apartment where she could stay.

Mr. Hollins testified that the day after the victim's death, he contacted an individual working for Northwestern Mutual Life Insurance concerning an insurance policy belonging to the victim that named the defendant as a beneficiary. Mr. Hollins testified that he could not remember if he had asked this individual to change the beneficiary of the victim's life insurance policy. Mr. Hollins testified that shortly following the victim's death, he filed a

wrongful death action against the defendant seeking $40 million in damages, and he would likely be entitled to thirty percent of any recovery.

On redirect examination, Mr. Hollins clarified that he filed the wrongful death action on behalf of the victim's minor children. Mr. Hollins also testified that one allegation contained in his request for a temporary injunction, concerning the defendant's weighing ninety pounds, was made prior to her going into drug rehabilitation. Mr. Hollins testified that he was told that the defendant needed to be treated on an inpatient basis for sixty to ninety days but that the defendant would not agree to that and wanted to come home and continue her rehabilitation on an outpatient basis. On recross-examination, Mr. Hollins testified that he was not aware that the defendant had not received follow-up treatment after she was released from rehabilitation because the victim had refused to pay for it. He explained that it was his understanding that the defendant simply refused to go. On further redirect examination, Mr. Hollins testified that the victim did not balk at paying for hotel bills, a rental car, and for a condominium for the defendant and that there had never been any dispute between the parties concerning bills.

The defendant's mother testified that on June 23, 2008, her daughter was living in an apartment. She testified that this apartment was about a ten minute drive from the former marital home. She testified that she found out that the victim had been murdered when the victim's housekeeper called her at home. She estimated that this call came in around 8:00 a.m. or 8:30 a.m. She testified that the housekeeper told her that she needed to come to the victim's residence quickly, and she did so. She testified that the police were already there when she arrived. She testified that her grandchildren were not at the residence when she arrived. She testified that she gave the police the names and birthdays of the missing children and that she told the police that the children were probably with their mother, the defendant. She explained that she told the police this because "[i]t was just the most logical place they could be." She testified that she called both her son (who was in the area) and the victim's lawyer and informed them of the murder, but she did not call the defendant because she did not have the defendant's cell phone number and the defendant's apartment did not have a landline. When the prosecutor asked her specifically whether the witness had called her daughter the day before the murder and talked to her for an extended period of time, she denied remembering doing so and denied remembering her daughter's phone number. She also testified that she did not go over to the defendant's apartment, or ask her son to go over to the defendant's apartment, to inform the defendant of what had happened even though the defendant's apartment was only ten minutes away.

On cross-examination, the defendant's mother testified that she and her daughter were "somewhat estranged." She also testified that on the day prior to the murder, she had several conversations with the victim concerning the possibility of their getting together for dinner,

but nothing ever came of these plans. On redirect examination, the prosecutor observed that the witness seemed to clearly remember various conversations with her son-in-law on the day before the murder, and asked her if she now could recollect talking with the defendant for nearly an hour on the same day. The witness claimed she still could not remember any such conversation.

The next witness for the State was Officer Albert Gordon with the Metropolitan Nashville Police Department. Officer Gordon stated that he was a patrol officer and that he responded to a potential homicide call at the victim's residence on June 23, 2008. He testified that he arrived at approximately 10:00 a.m., and there were two EMT paramedics on scene when he arrived. He testified that after speaking with the paramedics, he went up to the children's bedroom closet where the victim's body was located and glanced at it briefly. He then set up an incident command post, secured the crime scene, and notified the crime investigators. He testified that at some point a woman arrived at the residence and identified herself as the victim's mother-in-law and that he spoke with this person. He testified that two additional women, who identified themselves as the victim's housekeeper and nanny, were standing in front of the house when he arrived.

On cross-examination, Officer Gordon testified that at some point after he started securing the crime scene, Officer Mike Swooner arrived and relieved him of incident command. He testified that the victim's house was empty when he arrived and that other than doing a brief walk through of the premises to look in the upstairs bedroom closet, he did not perform any sort of protective sweep of the residence.

Officer Jeffrey Biggerstaff testified that he was an officer with the Metropolitan Nashville Police Department with seventeen years experience. He testified that he was a training officer and that on the day of the incident, he and a trainee arrived at the crime scene to assist detectives who were already at the scene. He testified that they arrived at the crime scene at approximately 10 a.m. He testified that the detectives in charge requested that he and his partner go to the defendant's apartment in an effort to locate the defendant and her children. He testified that the defendant's apartment was approximately half a mile from the victim's house. He testified that when he knocked on the door, the defendant answered and allowed them into the premises. The officer testified that the defendant appeared to be calm and that he could also observe the children calmly playing video games.

Officer Biggerstaff testified that the defendant never asked why they were there. He testified that he told the defendant that they were there to check on her welfare and the welfare of the children. He testified that he did not tell the defendant that her husband was deceased. He testified that he instructed the defendant to remain where she was until the detectives arrived and that he remained at the defendant's apartment until they did so.

On cross-examination, Officer Biggerstaff testified that the scene at the defendant's apartment appeared to be normal. He testified that he had been instructed by the detectives to notify them when he made contact with the defendant and her children, but the detectives never instructed him not to tell the defendant that her husband was dead. He testified that he made this decision to withhold this information on his own.

Officer William Stokes of the Metropolitan Police Department testified that he was a police detective and that he had responded to a call at the victim's house along with another detective, Officer Brad Putnam. He testified that he and Officer Putnam walked through the house after they arrived. He testified that he and another officer, Lieutenant Nancy Felder (his supervisor), then left the crime scene and went to the defendant's address. He testified that when he arrived at that location there were already two uniformed police officers there, one inside and one outside the apartment. He testified that the defendant and her three children were also there and that the two older boys were watching TV. He testified that the defendant never asked them why they were there.

Officer Stokes testified that he told the defendant that they would like to speak with her. He testified that he went to the defendant's apartment for the purpose of getting a statement from the defendant and that after she agreed to speak with them he tape recorded her statement. The witness was shown a CD and transcript of that interview, which he authenticated. They were entered into evidence and the interview was played for the jury. The witness also identified the defendant in open court.

Officer Stokes testified that he and Lieutenant Felder interviewed the defendant in the bedroom of the defendant's apartment, which was the only room in the apartment where they could have some degree of privacy from the defendant's older children. He testified that the defendant's toddler was present in the room during the interview. He testified that the tape recorder he used to record the interview was not hidden and in the open.

On cross-examination, Officer Stokes testified that the first interview with the defendant lasted for about an hour. He testified that the defendant answered all of the questions she was asked during this interview, and even directed officers to the location of her rental car in the apartment's parking lot. Officer Stokes also testified that at the end of the interview, when he asked the defendant if she would be willing to come to the police station for another interview, the defendant replied "absolutely." Officer Stokes testified that he had been prepared to inform the defendant that her husband was dead at several points during the interview, but was cut off by his supervisor, Lieutenant Nancy Fielder. At one point during the interview, the defendant asked the detectives "where is he," referring to her husband, at which point Officer Stokes replied to her: "He's at home." Officer Stokes testified that when the defendant was finally informed that her husband was dead (fifty

minutes into the interview), the defendant was very emotional and started hyperventilating.

Officer Stokes also testified that on an occasion following the interview he returned to the defendant's apartment complex for purposes of serving a warrant. He testified that the defendant was not home when they arrived, and they waited for her to return. He testified that when the defendant returned, her vehicle was being followed by a Dodge pickup truck that was being driven by a man. He testified that he saw this man get out of his pickup truck, walk over to the defendant's vehicle, and lean into the window. He testified that he never obtained the license tag number of this truck and never interviewed its driver. After the individual left, the officers executed the search warrants and seized several items. Officer Stokes testified that as they were leaving, the defendant indicated to them that she was concerned for her safety, and he advised her to call the police if she felt threatened.

On redirect examination, Officer Stokes clarified that the defendant had indicated to him that she was concerned for her safety because she was nervous staying by herself. He testified that he advised her to call the police if she thought anyone was prowling around outside her apartment. On recross-examination, Officer Stokes testified that the man in the truck was still within earshot when they approached the defendant's vehicle, identified themselves as police officers, and indicated that they had a search warrant. Officer Stokes testified that the individual got into his truck and left after hearing this information.

Officer Johnny Lawrence of the Metropolitan Nashville Police Department testified that his unit specialized in photographs, fingerprints, collecting evidence, crime scene reconstruction, and bloodstain interpretation. He testified that he investigated the crime scene at the victim's residence on June 23, 2008. Officer Lawrence testified that he created a number of diagrams and took a number of photographs of the crime scene, and he authenticated these items, which were then entered into evidence. Officer Lawrence testified that the tip of a latex glove was discovered in the children's bedroom, with the remainder of that latex glove being found inside the closet door of that same bedroom. Officer Lawrence also explained that he discovered a cell phone charger whose cord was missing and which appeared to have blood on it. He testified that he cut out several pieces of the carpeting in that bedroom because they appeared to have possible bloodstains.

Officer Lawrence testified that there was a strong odor of bleach when he went into the closet of the children's bedroom. He discovered a bleach bottle inside. He testified that further investigation revealed that bleach had been poured and splattered onto the victim's body. Officer Lawrence testified that in the children's bedroom he also discovered a closed water bottle, a pair of eyeglasses, a briefcase, and a man's watch near the bed. The briefcase contained a cell phone and some other items. Officer Lawrence testified that they searched the house but could not find the victim's wallet or his identification, and he testified that to

his knowledge those items had never been found. He testified that when he searched the house he came across a partially open window, which he photographed. He testified that he processed the window to see if he could locate any fingerprints, and he was able to lift several fingerprints from the outside of the windowpane.

Officer Lawrence testified that he was given a wine glass, which he processed for fingerprints and DNA. He testified that he collected a box of latex gloves from the laundry supply room of the victim's house. Officer Lawrence also testified in detail concerning the procedures he used to collect and secure the evidence that he collected in the case.

On cross-examination, Officer Lawrence testified that by the time he arrived at the crime scene, numerous police officers, emergency personnel and family members had been in the house. He also testified that he did not see any of the officers at the crime scene wearing the protective booties on their shoes that were designed to protect against biohazards and prevent items of evidence from being tracked from one room to another. Officer Lawrence testified that if the defendant had lived in the house for three years, he would have expected to find a significant amount of her DNA inside.

Ms. Alicia Mahoney, a crime scene investigator for the Metropolitan Nashville Police Department, testified concerning photographs she took of the crime scene on the morning of June 23, 2008, and additional investigation that she performed. Ms. Mahoney testified that she found two white latex gloves in the backyard behind the victim's residence, one of which was hung on a tree branch. She also testified that she found an empty beer can in the driveway area in the back of the victim's house and an empty beer bottle in a planter in the front yard, which she took into evidence.

Ms. Rhonda Evans, a crime scene technician with the Metropolitan Nashville Police Department, testified that she assisted Officer Lawrence with his investigation of the crime scene on June 23, 2008, by taking a bag of clothing to the property room. She testified that afterward she assisted Officer Putnam with collecting items from the defendant's house, including a white tank top, a pair of blue jeans, a pair of white high-heeled shoes, and a box of latex gloves that was labeled "Walgreen's." She also testified that she took latent prints from the crime scene and that she took photographs and lifted fingerprints from the defendant's vehicle. She testified that she took a photograph of what appeared to be a piece of a box of latex gloves from inside the defendant's vehicle and collected that item. She also testified in detail concerning the procedures that she used to collect and store the evidence that she collected. On cross-examination, Ms. Evans testified that the jeans she took into evidence were a size one and that the T-shirt she received was a size "small."

Ms. Linda Wilson, an analyst in the identification section of the Metropolitan

Nashville Police Department, testified that she had fifteen years of experience in analyzing fingerprints and was qualified by the court as an expert in latent print examination. Ms. Wilson testified that nine different sets of prints were discovered at the crime scene and given to her for analysis. She testified that most of the prints she received from the crime scene had no value because they did not have sufficient detail for her to make a valid comparison. She testified that a pair of prints recovered from the front door and from the bathroom sink were of sufficient quality to make a comparison, but did not match either the victim or the defendant. She testified that she was able to identify fingerprints found on the doorframe of the baby's bedroom, as well as prints from a water bottle found in the children's bedroom, as matching the victim. She testified that she was able to identify a print taken from the children's bedroom closet door frame as matching the defendant. She testified that there were no unidentified prints on the doorframe of that closet door that might have come from someone else. She testified that she had also identified fingerprints that were found on the outside of the partially open window to the victim's house, as well as on the driver's side door of the defendant's rental car, as matching the defendant.

On cross-examination, the witness testified that if someone had lived in a house for an extended period of time, their fingerprints would probably be found throughout the residence. In addition, she testified that there is no way to determine how long fingerprints have been on a surface. She testified that she had also examined all of the fingerprints from the crime scene to determine if any matched a man named James Dean Baker (who had an arrest record in the county) and that none did.

Ms. Amy Huston, a mutual friend of the victim and the defendant and the godmother of the defendant's youngest child, testified that sometime in April, following the defendant's release from rehabilitation, the defendant had called her and asked her what the victim knew about her (the defendant) having affairs. Ms. Huston testified that she told the defendant that she had no information on the subject. Ms. Huston testified that she had no further contact with the defendant until Sunday, June 22, 2008. She testified that she received a call from the defendant around 8:00 p.m. that evening. She testified that the defendant sounded very upset and asked her if she would call some additional girlfriends and come out and meet her. She testified that she got dressed and went to meet the defendant by herself at around 9:00 p.m. at an establishment named "Bricktops." She testified that when she arrived, the defendant was not there. She testified that soon thereafter, the defendant called her and told her that she had "cut herself shaving," and needed to "run by the drugstore and get a Band-Aid." When the defendant arrived at approximately 9:30 p.m., she had a Band-Aid on her thumb covering a cut that appeared to have been caused by a straight razor.

Ms. Huston testified that the defendant ordered a glass of wine and started talking. She testified that the defendant was making comments such as "how dare he divorce me,"

and "he can't do this . . . I'm the primary caregiver." She testified that their conversation was not genial.

Ms. Huston testified that in the entire time she had known the defendant, she had never known the defendant to work outside the home. She testified that she advised the defendant to get a job so that she could support herself, but the defendant did not receive this suggestion well. There was some further discussion about jobs requiring a drug test. She testified that she stayed with the defendant until around 11:00 p.m., and the defendant had three glasses of wine during this time. She testified that the defendant received a cell phone call during their conversation, and the defendant's cell phone appeared to be working normally. She testified that she could only hear one side of the phone conversation, which sounded like a "marital fight" from her perspective. She testified that during this conversation she heard the defendant say that "they were her kids and that he could not have them, that they were hers." She testified that she and the defendant both left the establishment at the same time and that she could see the defendant sitting in her car, possibly still talking on the phone, as she drove away. Ms. Huston testified that she had known both the victim and the defendant for a long time and that while the defendant was "not a large woman," the defendant was "not a big man."

On cross-examination, Ms. Huston testified that she considered the defendant to be a friend, which was why she had gotten out of bed and dressed to go meet her that evening. She also testified that if the defendant had been in trouble, she would have wanted to help her out and that she had hoped that the defendant would "address her drug issues and get better." The witness testified that when the defendant arrived at Bricktops that evening, she had an enormous handbag with her, and she testified that the defendant may have made some comment to the effect that she was "sort of living out of that bag." The witness testified that the victim was a regular drinker in social settings.

Ms. Erin Dutton, the records custodian for Metro Nashville Emergency Communications Center, took the stand and identified a recording of a 911 call that was received on May 21, 2008, from the victim's residence. This tape was authenticated and played for the jury.

Officer George Ward of the Metropolitan Nashville Police Department testified that he was a patrol officer and that he responded to a domestic disturbance that was reported on May 21, 2008. Officer Ward testified that he was informed by dispatch that the defendant was taking one of the children and had pushed a vehicle out of the way with her vehicle. When he arrived at the victim's house, he saw a black GMC Yukon at the end of the driveway with the defendant in the driver's seat. He testified that he saw the defendant look right at him and make eye contact with him before proceeding to turn left out of the driveway

-14-

and go in the other direction. Officer Ward testified that he had his lights on but his siren off at this time. He testified that when he saw the defendant pulling away, he turned his siren on and drove right behind the defendant. He testified that the defendant kept accelerating. He testified that when the defendant had finally reached a speed of 70 mph while still in a 30 mph residential zone, he backed off in order to avoid an accident. He testified that he chased the defendant for approximately a quarter-mile before he discontinued pursuit.

Officer Ward testified that when he returned to the victim's house, the victim was present. He testified that the victim's shirt was ripped and had a grass stain on it and that the victim's right bicep was bruised. He testified that the victim's vehicle was still at the residence and that there was some damage to the vehicle's rear bumper. Officer Ward took photographs of the victim, his vehicle, and the residence, and he authenticated these items, which were entered into evidence. Officer Ward testified that the defendant's vehicle was equipped with OnStar, which he used with the victim's consent to locate the defendant. He testified that he and a fellow officer assisted the victim in securing an order of protection and in taking out criminal warrants against the defendant.

On cross-examination, Officer Ward testified that he had been to the victim's residence previously, when the defendant had accused the victim of kidnapping after he had picked the elder boys up from school on the day he filed for divorce. Following Officer Ward's testimony, another officer also testified concerning this earlier domestic disturbance call and its aftermath.

Mr. Aaron Bagley testified that he worked at the Hickory Falls Bar and Grill in Smyrna, Tennessee. Mr. Bagley testified that on May 29, 2008, he was working as a bartender when the defendant came into the establishment to pick up a "to go" order. He testified that the defendant stayed for about forty-five minutes and that during that time, she started telling him all about the fact that she was going through a divorce. He testified that she stated that she had discovered her husband was cheating on her and had caught him flying women to come in and see him from other states. He testified that the defendant told him that if her husband "tried to take the babies" away from her, she would kill him. He testified that she appeared to be very distraught, bitter, and emotionally unstable during this conversation. He testified that the defendant ate her dinner at the bar and drank several glasses of white wine while she was there. He testified that the defendant repeated her claim that she would kill her husband a number of different times and in a number of different contexts. He testified that this conversation was unusual and memorable, even for a bartender. He testified that he had never seen the defendant before that evening and that he never saw her again until he saw her picture on the evening news. Following this testimony, he was shown a restaurant receipt from that evening, which listed his name as the server, and he read the signature at the bottom of that receipt, "Kelley."

On cross-examination, the witness acknowledged that he never called the police concerning this conversation, even though he took it seriously and had access to enough information to identify the defendant. He also agreed that in his initial statement to police, he indicated that the defendant looked very skinny and that he had underlined the word "very."

Officer Brad Putnam of the Metropolitan Nashville Police department, the lead investigator, testified concerning the crime scene in a manner consistent with the testimony of the other investigators. Officer Putnam authenticated a CD that had been made of a second police interview with the defendant following the homicide, which was entered into evidence and played for the jury. Officer Putnam testified that he had obtained the defendant's cell phone records during the course of his investigation and that these records indicated that the defendant had placed a fifty-four minute call to her mother on the day before the murder. On cross-examination, Officer Putnam discussed in detail numerous other individuals who were linked to the victim and/or the defendant, and he explained the degree to which the police did or did not investigate each individual.

Mr. Rick Greene, who had been in treatment with the defendant at Cumberland Heights, testified that the day following the murder the defendant called him over and told him that she had been to the former marital residence the night before, had entered it through the already-open front door, and had removed her children when she could not find her husband. Mr. Green further testified that she stated "I can't tell you anything because I don't want to have to lie to you" when he had asked her if she knew that her husband was in the closet that evening.

Ms. Michele Rey, an investigator for the Davidson County Sheriff's Office, testified that she recorded several phone calls that the defendant had made while she (the defendant) was an inmate. She identified and authenticated the tape of one such call, which was entered into evidence and played for the jury.

Dr. Thomas Deering, the State's forensic pathologist, testified that the victim weighted 163 pounds when he died and that he died as a result of strangulation – most likely by ligature. Dr. Deering also testified that there were signs that the victim had suffered multiple blunt force trauma to his head. The victim's body showed signs of post-mortem abrasions consistent with its having been dragged along the carpet. Finally, Dr. Deering testified that while great force had been used to strangle the victim, this force could have been generated by someone who was not overly strong if the assailant had used a ligature and the victim was struggling.

Agent Linda Littlejohn of the Tennessee Bureau of investigation, the State's expert

in micro-analysis, testified that she had analyzed a piece of a Walgreen's latex glove box that had been found in the defendant's car and determined that it matched a torn Walgreen's latex glove box found in the defendant's home. She further testified that she had made a physical comparison of the latex gloves found at the crime scene and determined that the three gloves discovered there were inconsistent with gloves coming from a box found at the victim's residence but were consistent with the gloves coming from the Walgreen's box found at the defendant's apartment.

Agent Jennifer Shipman, a forensic scientist for the Tennessee Bureau of Investigation and the State's expert in DNA analysis, testified that a DNA test performed on a blood stain found on the defendant's jeans revealed DNA from both the defendant and the victim. She testified that she found the defendant's DNA on the inside of the latex glove discovered in the children's bedroom and a mixture of the defendant's and possibly the victim's DNA on the outside of that glove. Finally, she testified that blood and DNA belonging to the victim were found on the base of the Motorola phone charger at the crime scene.

Mr. Elliot Webb, Walgreen's loss prevention supervisor, identified and authenticated store surveillance footage taken from a Walgreen's location on Charlotte Pike at 11:17 p.m. This footage, which was played for the jury, appeared to show the defendant removing a box of latex gloves from a shelf and then exiting the store without paying for it.

Following all of this testimony, the State rested. During a jury-out hearing, the defendant moved for a judgment of acquittal. The trial court denied this motion, and the defendant was advised of and waived her right to testify in her own defense pursuant to the procedures established in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999). The defense then presented the following testimony:

Officer Freddie Stromatt of the Metropolitan Nashville Police Department testified that he was a detective who had assisted in the homicide investigation involving the victim on June 23, 2008. He testified that he arrived at the crime scene at 9:00 a.m. or 10:00 a.m. and stayed there until 10:00 p.m. or 11:00 p.m. He testified that while he was at the crime scene, arrangements were made for the defendant to pick up a vehicle from the former marital residence. He testified that he was a part of the discussions arranging for the defendant to be provided with a vehicle. He testified that at approximately 9:15 p.m. that night, an individual named James Dean Baker arrived at the crime scene and stated that he was there to pick up a vehicle for the defendant. Officer Stromatt testified that he allowed Mr. Baker to pick up a vehicle for the defendant's use. While he was talking with Mr. Baker, he learned that Mr. Baker had met the defendant at Cumberland Heights Rehabilitation Center. Officer Stromatt testified that he checked Mr. Baker's identification when he picked up the vehicle to see if he had any outstanding warrants and that he determined that Mr.

Baker had a criminal record.

On cross-examination, Officer Stromatt testified that his encounter with Mr. Baker occurred as the result of his and other officers' attempts to accommodate the defendant by affording her a vehicle to drive while her rental vehicle was under investigation. Officer Stromatt testified that he asked Mr. Baker whether Mr. Baker had any knowledge of the events that had occurred in the house the previous evening and that Mr. Baker replied to him that he did not. On redirect-examination, Officer Stromatt testified that he would not just take someone's word that they were not involved in a crime but that to his knowledge neither he nor any of the other officers had ever interviewed Mr. Baker.

Ms. Pamela Jo Brady testified that she was a former administrative assistant for the Marshall Space Flight Center in Huntsville, Alabama, and had known the defendant since 1989, when the defendant was hired for a position there. Ms. Brady testified that she and the defendant developed a friendship outside the office. Ms. Brady testified that she was the maid of honor at the defendant's wedding to the victim. Ms. Brady testified that when the defendant was arrested on May 21, 2008, following a domestic dispute, the defendant called her, and she made some phone calls on the defendant's behalf. She also traveled to Nashville to assist the defendant following her arrest, and she spent a couple days with her while the defendant was staying at a hotel. Ms. Brady described the defendant's physical appearance in May of 2008 as "visibly shaken, and she had night sweats." Ms. Brady also described the defendant as "very nervous," "pale and sick," and "seem[ing] to have pneumonia." Ms. Brady testified that the defendant looked the smallest that she had ever seen her during this time period and appeared to weigh somewhere in the range of ninety pounds. She testified that it was very difficult for the defendant to talk or communicate during the time she stayed with her at the hotel.

Ms. Brady testified that at one point during her stay with the defendant at the hotel, she witnessed the defendant receive a phone call from the victim. When she received the phone call, the defendant appeared to be visibly shaken, and she stated to Ms. Brady that she did not want to answer the phone because she was afraid that she might be breaching an order of protection. Ms. Brady stated that the defendant told her "he's called so many times . . . I'm going to see what he wants." Ms. Brady said she listened to the defendant's side of the ensuing conversation, and the defendant stated, "Do not come and get me, no, do not come and get me." She stated that the defendant started crying and asked, "Jim, why are you doing this, why are you putting me through this, why are you doing this?"

Ms. Brady testified that the following month, in June of 2008, the defendant came to visit her in Huntsville for the weekend. She testified that the defendant arrived on Saturday, June 14, 2008, and left on Monday, June 16, 2008. She testified that the defendant had been

scheduled to arrive between 7:00 p.m. and 9:00 p.m. on Friday the 13th, but did not arrive until 2:00 a.m. on Saturday morning. When the defendant arrived, she appeared dazed and confused. Ms. Brady testified that the defendant appeared worse physically than when she had seen her in May. She testified that the defendant was nervous, could not sleep, and had night sweats. Ms. Brady testified that during her weekend visit, the defendant never expressed any animosity towards the victim. The witness also testified that during the time she knew her, the defendant was always a loving mother. Ms. Brady testified that she had met the victim on a handful occasions and that the victim always had a drink in his hand.

On cross-examination, Ms. Brady acknowledged that she had not seen the victim in at least six years. She also testified that she was not aware that the defendant had a drug problem. When the prosecutor asked her if the defendant's appearance – including her being nervous and having night sweats – could have been a natural result of the defendant's drug addiction, the witness responded, "I'm not medically qualified to answer that question."

Following Ms. Brady's testimony, Dr. Amanda Sparks-Bushnell, the defendant's psychiatrist, took the stand. Dr. Bushnell testified that she began treating the defendant in the spring of 2008 for anxiety, depression, panic disorder, and Post Traumatic Stress Disorder. She testified that she saw the defendant on an approximately weekly basis between April and June of 2008. She testified that she gave the defendant her cell phone number and that the defendant called her frequently. She testified that the defendant was "quite small" and that with respect to the defendant's appearance, "the term waif like is what keeps coming to mind." Dr. Bushnell stated that when the defendant wore a sleeveless shirt, she noticed that the defendant had loose skin on the back of her triceps that was indicative of rapid weight loss and that the defendant had "no definition between the biceps muscle, the triceps muscle."

Dr. Bushnell stated that she was treating the defendant with Adderall, Zoloft, Provigil, and Clonazepam. Dr. Bushnell testified that she also prescribed Pristiq later during the defendant's treatment when "[h]er anxiety was going beyond what the Zoloft could handle." Dr. Bushnell testified that the defendant was not psychotic and that she could find no evidence that the defendant had ever had a psychotic episode.

On cross-examination, Dr. Bushnell clarified that prior to being incarcerated for the victim's murder, the defendant "was quite gaunt and emaciated" and that she only started to look healthier and put on more weight after her incarceration. Dr. Bushnell testified that if the defendant had been mixing all the different medications that she had been prescribed with alcohol and/or pain medications, this could have led to some of the behaviors that she had described in her direct testimony.

Dr. Jonathan Arden, the defendant's expert in the field forensic pathology, testified that he had reviewed various documents that he had received from the State, including the victim's autopsy report, toxicology report, the medical examiner's investigation report, and photographs of the crime scene and the autopsy. Dr. Arden testified that in his expert opinion, the victim's death was caused by strangulation by ligature. Dr. Arden testified that a substantial amount of force was used over an extended period of time to strangle the victim. Dr. Arden testified that the amount of force that had been used to strangle the victim was far more than was necessary to accomplish the strangulation, and in his opinion the victim was probably strangled in a minute or less but certainly no more than three or four minutes. Dr. Arden testified that in his opinion, it would have taken a strong person to accomplish this strangulation because the ligature had been pulled very tightly and held with a large amount of force. Dr. Arden also testified that the victim had superficial injuries to his face that he believed were probably caused by some kind of altercation. Marks on the victim's neck indicated that the victim was probably moving against the ligature during this altercation.

Dr. Arden testified that he had reviewed the victim's toxicology report and found that the victim had a blood alcohol content of 0.15. Dr. Arden testified that a 0.15 blood alcohol content was almost double the amount necessary to qualify for driving under the influence in most states. Dr. Arden testified that an experienced drinker would be able to stand up and have a conversation with a blood alcohol content at that level but would have diminished reflexes and reaction times.

On cross-examination, Dr. Arden testified that he had never interviewed the defendant and that he was not testifying that it was physically impossible for the defendant to have strangled the victim. Dr. Arden testified that he was aware that the defendant had previously worked for a medical examiner's office in Nashville, but he was not aware that she had assisted with autopsies. Dr. Arden agreed with the prosecutor that strength and force were not the same thing. Dr. Arden also agreed that it was possible for the victim to have lost consciousness within ten seconds after the application of the ligature, and he agreed that once the victim lost consciousness it would not take a huge amount of pressure to complete the strangulation. Following this testimony, the defendant rested.

In rebuttal, the State presented the testimony of Mr. James Dean Baker. Mr. Baker testified that he knew the defendant because they were in rehabilitation together. He testified that after the defendant was released from Cumberland Heights, he assisted her with moving and things of that nature. He testified that he spoke with the defendant on the morning after the victim was killed and that she asked him to help her get her vehicle from her house. He testified that when he arrived at the crime scene, he talked to Sergeant Freddy Stromatt, with whom he was somewhat familiar because he worked with one of the officer's relatives at the fire department. Mr. Baker testified that he retrieved the vehicle and that afterward, he and

the defendant went to an establishment and got something to eat.

Mr. Baker testified that he had never met the victim and that he did not know anything about – or have any personal knowledge of – how the victim came to be murdered. Mr. Baker testified that after he and the defendant had dinner on the night after the murder, the defendant spoke with him on the phone and told him that it "wasn't her on the Walgreens video." The defendant also asked him to pray for her and write her letters.

On cross-examination, Mr. Baker testified that he did "not really" use Cumberland Heights as a way to meet women and that he was unaware that he had a reputation there for being a "flirt." Mr. Baker also acknowledged on the stand that he was involved in a divorce from his wife in 1997 and 1998 and acknowledged that his wife was represented by the victim during that divorce. The witness explained that he had learned this for the first time when his brother had told him that morning, and he explained that his memory from that time period was "blurry" because he was "using crack cocaine pretty bad."

Mr. Baker also denied remembering anything about a restraining order that the victim had obtained for his (Mr. Baker's) wife during their divorce. He denied remembering anything about his going out to his former wife's house with a hack saw and trying to saw through a "club" that was securing the steering wheel of a Mustang, and he claimed that he was not arrested on that occasion. The witness acknowledged that he was terminated from his job at the fire department because of arrests for attempted burglary, stalking, trespassing, and doing drugs. The witness acknowledged frequently calling the cell phones and pagers of members of the 20th Judicial Drug Task Force following his arrest on drug charges. The witness concluded by testifying that police officers had not interviewed him at any point in the last two years, and he testified that they had only contacted him two or three days ago with a request for him to testify at the defendant's trial.

After this testimony, both sides rested. The jury was charged, retired to deliberate, and returned sometime later with a verdict finding the defendant guilty as charged. The defendant was automatically sentenced to life in prison. On May 28, 2010, the defendant filed a timely motion for new trial, which was denied by the trial court following a hearing. The defendant now appeals, raising numerous challenges to her conviction, which we will address in turn.

**ANALYSIS**

The defendant raises numerous challenges to her conviction. She claims that the evidence is insufficient to support the jury's finding of premeditation. She claims that the trial court erred by denying her motion to suppress certain evidence that was seized during

three separate police searches of the victim's residence on the grounds that these searches were conducted without her consent or a warrant. She claims the trial court erred by denying her motion to suppress two statements that she gave to police while she was at her apartment, on the grounds that she was not provided with *Miranda* warnings prior to making the statements. She claims that the trial court erred by admitting expert testimony concerning a physical comparison made between various latex gloves on the grounds that the expert's methodology was not sufficiently scientific in nature. She claims the trial court erred by admitting a police officer's testimony concerning a prior domestic disturbance between herself and the victim on the grounds that this testimony was propensity evidence concerning prior bad acts and was consequently inadmissible under the rules of evidence. The defendant claims that the trial court erred by admitting a tape of a 911 call made by the victim during that same domestic disturbance, on the grounds its admission violated her rights under the Confrontation Clause. Finally, the defendant argues that the trial court erred by failing to grant her motion for a mistrial after a witness testified that he found out about the murder when a third party informed him that the defendant had killed the victim. For the reasons that follow, we deny the defendant's claims and affirm the judgment of the trial court.

## I.

The defendant claims that the evidence presented at trial was insufficient to support her conviction. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Great weight is given to the result reached by the jury in a criminal trial; their decisions on matters such as the credibility of witnesses, the weight to be accorded the witnesses' testimony, and the resolution of any conflicts in the evidence are not revisited on appeal. *See Dorantes*, 331 S.W.3d at 379. Moreover, "on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Id.* (internal quotation omitted). In essence, a jury's verdict of guilt strips the defendant of the presumption of innocence and replaces it with a presumption of guilt, one which the defendant must strive to overcome. *See id.*

When weighing the sufficiency of the evidence, direct and circumstantial evidence must be treated the same, and the standard of appellate review is the same for both evidentiary types. *Id.* at 379-81. Even when a criminal offense has been proven exclusively through circumstantial evidence, the weight given that evidence, the inferences to be drawn from that evidence, and the extent to which all the circumstances are consistent with guilt are primarily jury questions. *Id.* at 379. Under no circumstances may an appellate court "substitute its inferences for those drawn by the trier of fact," regardless of whether direct

evidence exists or the State's case is wholly circumstantial. *Id.*

In the case at bar, the defendant was convicted of first degree (premeditated) murder. "First degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). "Premeditation" means the formation of an "intent to kill," done: (1) "prior to the act itself" (but not necessarily held "for any definite period of time" prior to the act), (2) "after the exercise of reflection and judgment," and (3) while "sufficiently free from excitement and passion." T. C. A. § 39-13-202(d). The defendant claims that the State failed to provide sufficient evidence for a reasonable jury to conclude that she premeditated the victim's murder beyond a reasonable doubt. However, ample evidence exists in the record to support a finding of premeditation.

"Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment'. . . ." *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting T.C.A. § 39-13-202(d)). A "defendant's threats or declarations of intent to kill" and a defendant's "preparations to conceal the crime undertaken before the crime is committed" are both some of the many factors from which a reasonable jury may infer premeditation. *Id.* at 53-54.

The State presented sufficient evidence with respect to either of these factors for a jury to have reasonably inferred the defendant's premeditation. Concerning the defendant's declarations and threats, Mr. Aaron Bagley, a bartender who served the defendant on May 29, 2008, testified that the defendant repeatedly told him that she would kill the victim if he tried to take her children. Ms. Amy Huston, the victim's friend, also testified that the victim told her that the children were hers and the victim "couldn't have them." In addition, the defendant's son testified that the defendant had previously knocked the victim to the ground and threatened him with a knife. Concerning advance preparations to conceal the crime, Mr. Elliott Webb, a loss prevention officer at Walgreen's Pharmancy, authenticated video footage that depicts the defendant shoplifting a box of latex gloves from a store on the night of the victim's murder. Law enforcement witnesses testified that a box of Walgreen's latex gloves was found at the defendant's residence, and a torn piece of cardboard matching that box was discovered in a car rented by the defendant. Law enforcement witnesses also testified that three latex gloves were found at the crime scene, and the defendant's DNA was found inside and outside one of these gloves. The State's micro-analysis expert testified that the gloves found at the crime scene were consistent with gloves that were still contained in the Walgreen's box found at the defendant's residence. This evidence supports a reasonable inference that the defendant obtained the latex gloves in advance for purposes of helping her to conceal her crime, and did in fact so use them. In light of this and other evidence, a reasonable jury could conclude that the defendant premeditated the victim's murder beyond a reasonable doubt.

The defendant also argues that she is entitled to relief because the State's case was circumstantial, and the State failed to exclude all other reasonable hypotheses except guilt, citing to *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). As we have explained, the Supreme Court overruled in *Dorantes* any distinction that may have been drawn previously between the standards of review applicable to sufficiency of the evidence challenges based on cases established by direct evidence and those established solely by circumstantial evidence, and now both direct and circumstantial evidence cases are reviewed using the same, more lenient, standard. *Dorantes*, 331 S.W.3d 379. Consequently, the defendant's argument no longer finds any basis in the law.

To the extent the defendant's argument on this score could be interpreted as a challenge to the sufficiency of the State's evidence concerning elements of first degree murder other than premeditation, we conclude that the testimony that we have previously summarized suffices to support the remaining elements of the defendant's conviction, when viewed in the light most favorable to the State. The defendant's challenge to the sufficiency of the evidence is denied.

## II.

The defendant claims that the trial court erred by failing to suppress certain evidence found by the police during warantless searches of the residence that she once shared with the victim. These searches occurred on three separate days and include a search that was conducted several weeks after the murder. The trial court held that the defendant lacked standing to challenge the searches at issue because she was excluded from the residence by an order of protection that was still in effect when the searches occurred. The trial court concluded that even if the defendant possessed standing, the first warrantless search was permissible because the police were securing a crime scene (an exigent circumstance), the second search on the following day was permissible because the police were merely securing a particular piece of evidence that they had seen in plain view on the previous day and had inadvertently left behind, and the third search, occurring weeks later, was permissible because the police had obtained the consent of the victim's executor.

We review challenges to a trial court's denial of a defendant's motion to suppress under the well-known standard established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996): "'[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise,'" and a trial court's conclusions of law are reviewed "under a *de novo* standard without according any presumption of correctness to those conclusions." *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001) (quoting *Odom*, 928 S.W.2d at 23). Under this standard, we conclude that the trial court's decision must be upheld on the grounds that, under the totality of the circumstances, the defendant did not have a reasonable expectation

-24-

of privacy in the premises when the police conducted the searches.

Both the United States Constitution and the Tennessee Constitution protect citizens against unreasonable searches and seizures of their property. *See generally* U.S. CONST. AMEND. IV ( stating "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" and asserting that search warrants shall issue only "upon probable cause, supported by Oath or affirmation"); TENN. CONST. art. I, § 7 (stating "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures," and precluding the issuance of search warrants except upon "evidence of the fact committed"). "The purpose of [these protections] is to safeguard the privacy and security of individuals against arbitrary invasions of government officials." *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001) (internal quotations omitted). If the State is found to have violated the constitutional provisions described above, evidence discovered during the unlawful search may be suppressed pursuant to the exclusionary rule. *See, e.g.*, *Murray v. United States*, 487 U.S. 533, 536 (1988); *Weeks v. United States*, 232 U.S. 383, 398 (1914). As our supreme court has explained, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Bridges*, 963 S.W.2d 487 (Tenn. 1997)

However, the inquiry concerning "whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it" in turn "requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas*, 439 U.S. at 140. Consequently, in order to successfully challenge a police search pursuant to the Fourth Amendment or section 7, the individual bringing the challenge must establish not only that the search was illegal but also that the individual had a legitimate expectation of privacy in the area searched. *E.g., Rawlings v. Ky.*, 448 U.S. 98, 104 (1980) ("Petitioner, of course, bears the burden of proving not only that the [government's] search [of the] purse was illegal, but also that he had a legitimate expectation of privacy in that purse."); *State v. Roberge*, 642 S.W.2d 716, 718 (Tenn. 1982) ("It is fundamental that one challenging the reasonableness of a search or seizure has the burden of establishing a legitimate expectation of privacy in the place or property which is searched."). By longstanding rule of law applicable to both federal and state constitutional analysis, establishing a "legitimate expectation of privacy" requires an individual to establish two separate components: (1) that the individual had a real, subjective expectation of privacy in the area searched and (2) that society is willing to recognize the individual's subjective expectation as reasonable and justified under the circumstances. *E.g., Smith v. Maryland*,

442 U.S. 735, 740-41 (1979); *Munn*, 56 S.W.3d at 493. This court has recognized several factors that should be considered for purposes of assisting in the constitutional inquiry: "(1) property ownership; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether [the defendant] has the right to exclude others from that place; (5) whether [the defendant] has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether [the defendant] took normal precautions to maintain his privacy; and (7) whether [the defendant] was legitimately on the premises." *State v. Turnbill*, 640 S.W.2d 40, 46 (Tenn. Crim. App. 1982). Consideration of these and other relevant factors leads us to conclude that the defendant has failed to establish a legitimate expectation of privacy with respect to the premises searched.

The defendant's first challenge to the trial court's conclusion that she had no standing to challenge the searches is that the pending divorce action between the parties, and the accompanying *ex parte* order granting the victim exclusive possession of their former marital residence, abated with his death. However, even assuming the defendant is correct in this assertion, the operation of civil law is not dispositive of the Fourth Amendment inquiry. As our Supreme Court has explained, "[i]n defining the scope of [Fourth Amendment protections], we adhere to the view expressed in [prior] cases that arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." *Rakas*, 439 U.S. at 143. Rather, "'(n)o one circumstance is talismanic to the *Rakas* inquiry.'" *Turnbill*, 640 S.W.2d at 46 (quoting *United States v. Haydel*, 649 F.2d 1152, 1154-1155 (5th Cir. 1981)).

The defendant also directs our attention to the fact that the victim had surrendered his interest in the marital home to the defendant *via* a quit claim deed in 2005, and consequently, the defendant was the sole title holder of record of the home at the time of the searches. The defendant further directs our attention to evidence in the record that the defendant and the victim were engaged in an "on-again, off-again" relationship during the months preceding the murder, that they were attempting to reconcile at the time of the victim's death, and that the defendant stored some of her clothing at the house. While these facts standing alone might tend to favor the defendant, they are insufficient to establish a reasonable expectation of privacy in the residence when viewed in the context of the record as a whole. At most, they establish that the defendant had an ownership interest in the property searched and a subjective expectation of privacy. However, mere title "does not establish a privacy interest in property, *State v. Smith*, 656 S.W.2d 882, 887 (Tenn. Crim. App. 1983), and these two factors must be balanced against the remaining *Turnbull* and other relevant factors.

A person who does not live at a residence and who has no key to a residence usually

has no reasonable expectation of privacy in that residence. *See State v. Transou*, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996). It is undisputed that the defendant lived in a separate location—an apartment located approximately one-half of a mile from the residence at issue. Moreover, the defendant has failed to direct our attention to any clear evidence in the record that supports her claim that she still had a key to the residence that functioned after (as record testimony reflects) the victim had the locks changed following her departure on May 5, 2008.

The defendant has failed to establish that she had a possessory interest in either the place searched or the items seized. While the record does reflect that the victim and the defendant made attempts at reconciliation, it is undisputed that prior to the victim's murder, the defendant was under an order of protection to stay away from the residence. Even if the defendant had established in the trial court that she had a real and subjective belief that she was entitled to privacy in her former marital home, holding such an expectation would not have been reasonable in light of the fact that she was legally barred from so much as visiting the premises until sometime following the victim's demise.

Because we hold that the defendant had no reasonable expectation of privacy in the premises searched, we need not address the State's argument that, even assuming the defendant had a constitutionally-protected privacy interest in the area that was searched, the warrantless searches at issue were constitutionally permissible under the exigent circumstances, plain view, and consent exceptions to the warrant requirement. The defendant's claim that the trial court erred by failing to suppress the evidence found as a result of the three police searches is denied.

## III.

The defendant claims that the trial court erred by denying her motion to suppress two statements that she gave to police on June 23, 2008 – the morning following the victim's murder. The defendant argues that these statements were obtained by police in violation of *Miranda v. Arizona*, 384 U.S. 436 (1964), because the police failed to inform the defendant of her *Miranda* rights prior to questioning her and because the police failed to cease questioning after (she claims) she invoked her right to counsel. The trial court denied the defendant's suppression motion, finding that the defendant was not in custody during these interviews and as a consequence was not entitled to *Miranda* protections. We do not believe the trial court erred in reaching this conclusion, and we deny the defendant's claim accordingly.

As we have stated, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Odom*, 928 S.W.2d at 23. "[I]ssues of whether a defendant was placed in custody, interrogated, or voluntarily gave a confession

-27-

are primarily issues of fact," to which this court grants deference. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). "Our review of a trial court's application of law to the facts, however, is conducted under a *de novo* standard of review." *Id.*

Both the Fifth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution protect an individual's right against self-incrimination. *See, e.g., Miranda*, 384 U.S. at 474; *State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). In order to help protect this right, courts have developed a longstanding, judicially-prescribed prophylactic rule requiring the police to inform any suspect in their custody of certain constitutional rights – including the right to remain silent and the right to be represented by counsel – prior to questioning. *See Miranda*, 384 U.S. at 444. The State may not use any statement made by the suspect until the suspect has executed a knowing and intelligent waiver of those rights. *Id.* at 474. If the suspect in custody invokes his or her right to counsel, all questioning must cease. *Id.*

As a prophylactic rule, however, *Miranda* requirements are justified only by reference to their purpose. *See Maryland v. Shatzer*, 130 S. Ct. 1213, 1220 (2010). The *Miranda* rule applies only when a suspect is in custody. *See California v. Beheler*, 463 U.S. 1121, 1124 (1983). While a suspect may be deemed to be "in custody" even in the absence of a formal arrest, in order to so qualify, the suspect's freedom of movement must have been restrained to the degree normally associated with a formal arrest. *Id.* "[T]he test is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). The trial court found that the defendant was not in custody during her questioning, and the record supports this finding.

Numerous factors are generally relevant to the inquiry concerning whether a reasonable person would have felt the requisite deprivation of freedom of movement. These factors include:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the

-28-

interview at will.

*Id.* Consideration of these factors in this case weighs strongly in favor of the State.

As the trial court found, the two interviews in question took place in the defendant's own apartment. The defendant was already at her apartment when the first police officers arrived and consequently was not transported to any location against her will. The trial court found that the officers' tone during the interviews was "pleasant and conversational." The officers did not level any accusations at the defendant or confront her with evidence that might indicate her guilt. Under the specifics circumstances and in light of the need to provide care for two of the defendant's three children, who were with her at the time, there were not an excessive number of officers present at the defendant's apartment. The defendant was permitted to take breaks and attend to her youngest child during one of the interviews. During the second interview, when the defendant made a reference to her lawyer, the officers indicated to the defendant that she had the ability to terminate the interview. The trial court noted that the defendant indicated that she wished to continue assisting the officers with their investigation. Our review of the record leads us to conclude that the trial court's findings are adequately supported by the record.

In light of these findings, the trial court concluded that, under the totality of the circumstances, the defendant was not in custody. We agree with this assessment. The defendant argues that, despite the location of the interview, she was effectively in custody at the time because the police acted in a manner that converted her once-tranquil home into a coercive, police-dominated atmosphere. In support of her claim, the defendant asserts that (1) the officers did not inform her that she was free to leave; (2) one of the detectives requested permission to search her apartment, and requested that she provide them some of her clothing; (3) the officers initiated the interviews and remained in and around her apartment between the interviews; (4) at one point, one of the officers told the defendant not to leave until a another officer arrived; and (5) the interviews were recorded. To the extent that these assertions conflict with the findings of the trial court, we defer to the findings of the court below, because the evidence does not preponderate against them.

There appears to be no dispute that the police initiated these interviews and that the interviews were recorded. However, these and the other remaining facts relied on by the defendant would hold true with respect to most police interrogations. The Supreme Court has cautioned that while "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime," officers "are not required to administer *Miranda* warnings to everyone whom they question."

*Oregon v. Mathiason*, 429 U.S. 492 (U.S. 1977). We agree with the trial court that these facts cited by the defendant, in and of themselves, were insufficient to cause a reasonable person to feel as though their liberty had been restrained to the degree associated with a formal arrest. Because the defendant was not "in custody" for *Miranda* purposes, the police were not required to provide the defendant with *Miranda* warnings or cease all questioning if the defendant made an unequivocal request for an attorney. The defendant's claim that the trial court erred by denying her motion to suppress is denied.

## IV.

The defendant claims that the trial court erred by admitting expert forensic testimony pertaining to a physical comparison the State's expert made of certain latex gloves. The testimony at issue concerned the State's micro-analysis expert's comparison of three different latex gloves that were found at the crime scene (two in the backyard, and a torn one – one piece of which was found in the boys' bedroom, with the remainder in the closet of that bedroom) with a latex glove that was taken from a Walgreen's box of latex gloves found at the defendant's residence. The State's expert in the field of micro-analysis, Agent Linda Littlejohn, testified that the three gloves found at the crime scene were consistent in size and appearance with those in the Walgreen's box and that they were inconsistent in their size and appearance with some latex gloves that came from a different box (Red Cross brand) that was found at the victim's house.

Decisions concerning the admissibility of expert testimony are left to the broad discretion of the trial court. *See State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). A trial court's ruling will not be disturbed absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997). No such abuse of discretion occurred when the trial court admitted the testimony at issue.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 provides for the admission of expert testimony under the appropriate circumstances: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 discusses the permissible sources of information from which an expert may draw his or her opinion:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.  Together, these rules require a trial court to "determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness." *McDaniel*, 955 S.W.2d at 265.  Such an inquiry "necessarily require[s] a determination as to the scientific validity or reliability of the evidence." *Id.*

The defendant never challenged the expert's qualifications, nor did she object to the expert's testimony at trial.  Rather, the defendant challenged only the expert's methodology, through a pretrial motion filed on April 19, 2010.  In that motion, the defendant claimed that, because the expert's opinion was based solely on a physical comparison of the gloves, it did not possess sufficient scientific substance to satisfy *McDaniel*.  The trial court denied this motion in a written order on April 23, 2010.

In that written order, the trial court recited and applied the appropriate standards from Rule 702, Rule 703, *McDaniel*, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the seminal case in the field.  The trial court reasoned that although the expert's opinion did not rely on any chemical tests or analysis, her testimony about the comparative measurements of the gloves was similar to other types of analyses, including footprint analysis, that courts have found admissible in cases such as *State v. Reid*, 91 S.W.3d 247, 294-96 (2002).  After reviewing the testimony at issue and the applicable precedent, we cannot discern any way in which this decision was illogical or contrary to reason.  Consequently, we conclude that the trial court did not abuse its discretion in admitting the expert testimony at issue.

## V.

The defendant claims that the trial court erred by denying one of her motions *in limine*

-31-

and thereby permitting the admission of evidence pertaining to a prior domestic dispute involving the defendant and the victim. The defendant's motion concerned certain testimony of Officer George Ward of the Metropolitan Nashville Police Department about the events that occurred when he responded to an emergency call at the victim's residence on May 21, 2008. The officer testified that he was told by "dispatch" that the defendant was "taking one of the children" and "had pushed a vehicle out of the way with her vehicle." The officer further testified that when he arrived, the defendant drove away in her vehicle and instigated a high speed chase through a residential neighborhood – at speeds in excess of seventy miles per hour – until he elected to discontinue the pursuit in the interest of safety. The defendant contends that this testimony should have been excluded under Tennessee Rule of Evidence 404(b) as "propensity" or character evidence that was offered by the State to prove that the defendant acted in conformity with that bad character trait on the date of the murder. We disagree.

As a general rule, all relevant evidence is admissible unless a particular constitutional provision, statute, or rule excludes it. Tenn. R. Evid. 402. However, evidence concerning prior "bad acts" committed by the defendant may be inadmissible under Rule 404(b), which states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This rule embodies the longstanding notion that the State should not be permitted to use evidence of a person's prior bad acts for purposes of establishing that the defendant has a propensity to commit those types of bad acts, and therefore likely committed the crime of which they stand accused. Evidence of a defendant's prior crimes or bad acts may, however, be admissible for other purposes. "'[O]ther purposes' have been defined to include: (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation." *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004).

When the prosecution seeks to introduce evidence of a defendant's prior bad acts at trial, the trial court should, *inter alia*, "hold a hearing outside the jury's presence" and "determine that a material issue exists other than conduct conforming with a character trait" before admitting the evidence. *Id.* The defendant does not dispute that the trial court followed the proper procedure prior to admitting the officer's testimony, and the record reflects that the trial court held the appropriate hearing on July 8, 2009 (at which time it heard testimony from Officer Ward and listened to the arguments of both parties). The trial court issued a written order concerning the testimony on December 17, 2009. That order cited to the applicable law and applied the appropriate legal standard. In the order, the trial court summarized Officer Ward's testimony and concluded that his testimony was not prohibited by Rule 404(b) because the evidence was being offered for purposes of establishing the defendant's motive and the lack of an accident or mistake.

"Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). "If the procedures in Rule 404(b) are substantially followed, the trial court's decision will be given great deference and will be reversed only for an abuse of discretion. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.* We cannot conclude that the trial court abused its discretion under these standards when it admitted the evidence at issue.

Rather, we agree with the trial court's analysis. The defendant was charged with first degree premeditated murder. The State did not attempt to offer evidence of prior murders committed by the defendant in order to help prove that she committed this particular murder. Nor was Officer Ward's testimony concerning the defendant's prior speeding, reckless driving, and evasion of arrest being offered for the purpose of establishing that she committed any of those acts on the day in question.

Rather, this evidence was introduced to show that the defendant desperately wanted possession of her children and that she strongly opposed the victim's claims of custody. The State's theory of the case was that the defendant killed the victim because she feared that he was about to gain custody of their children during the pending divorce; her jealous desire to exclusively possess the children drove her to murder. In this particular context, we conclude that the evidence offered by the State concerning the defendant's prior crimes was being used not to establish a propensity to commit additional such crimes, but rather to establish the defendant's motive for committing a different crime altogether. Because it was evidence offered for purposes of establishing the defendant's motive for murder, Officer's Ward testimony was not prohibited by Rule 404(b), and the trial court did not err by denying the defendant's motion *in limine* and allowing its admission.

## VI.

The defendant also claims that the trial court erred by denying her motion *in limine* and admitting a call that the victim made to a 911 operator concerning the aforementioned domestic disturbance, on the grounds that playing the phone call for the jury violated her rights under the Confrontation Clause. During the phone call at issue, the victim stated to the operator that his wife was under the influence of drugs and was trying to forcibly take away his infant daughter. The trial court denied the defendant's motion *in limine* on the grounds that the statements at issue were made during an ongoing emergency and were therefore non-testimonial in nature and admissible consistent with the Confrontation Clause. We agree with the trial court's analysis.

The Sixth Amendment's Confrontation Clause, made applicable to the States through the due process Clause of the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 406-07 (1965), provides that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. AMEND. VI. More specifically, "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability [of the witness] and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The fine distinction that must be drawn for constitutional purposes between testimonial and non-testimonial statements has at times proven elusive for courts. *See, e.g., Davis v. Washington*, 547 U.S. 813, 830 (2006). However, it is clear that while "testimonial" evidence includes "police interrogations," *Crawford*, 541 U.S. at 68, "[s]tatements are non-testimonial when made in the course of police interrogation under . . . an ongoing emergency," *Davis*, 547 U.S. at 822. The principle driving the distinction between these two types of situations appears to be the purpose of the statement: if the statement is intended to serve as "'a solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" *Crawford*, 541 U.S. at 51 (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)), then it is testimonial, but if it is made for some other reason or purpose, then it is not testimonial, *see Davis*, 547 U.S. at 828.

But regardless of the precise distinction, it is clear that the 911 call in this case was non-testimonial in nature because it is factually indistinguishable from a 911 call that the Supreme Court held to be nontestimonial in *Davis*. As the Court explained in that case, "[a] 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Davis*, 547 U.S. at 827 (quoting *Crawford*, 541 U.S. at 51). The *Davis* Court believed that this conclusion was confirmed by the fact that the person making the 911 call was "speaking about events as they were actually happening, rather than 'describ[ing] past events,'" the call at issue "was plainly a call for help against a *bona fide* physical threat," "the elicited statements were necessary to be able to resolve the present emergency," and the statements at issue were made "in an environment that was not tranquil." *Id.* (quoting *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (plurality opinion)). These same characterizations apply with equal force to the 911 call at issue in the present case.

The defendant claims that the holding of *Davis* should not govern her case because (1) the victim "made several statements about the [defendant] which were not necessary to resolve the ongoing emergency; (2) "[m]any of these statements were conversational in nature;" and (3) the victim "was an attorney, who undoubtedly would have been aware of the legal consequences of his statements." While the Supreme Court acknowledged in *Davis* the possibility that a 911 call "which begins as an interrogation to determine the need for

-34-

emergency assistance" could potentially "evolve into testimonial statements" after the emergency ended, nothing in the record suggests that the emergency had ended when the statements at issue were made – the defendant was still in the early stages of high-speed flight, the victim's child was still missing and in imminent danger, and the overall atmosphere had not yet become tranquil through the passage of time.

Moreover, otherwise non-testimonial statements are not rendered testimonial simply because they are made in a calm or conversational tone of voice, or because they are made by a lawyer. These and other such facts are not significant in and of themselves; they are significant only because they may be relevant as a part of the overall inquiry into whether the ultimate purpose of the conversation was to establish or prove some fact in a court of law, or to serve some other purpose. The facts cited by the defendant notwithstanding, it is plain from the record that (1) an actual emergency occurred on May 21, 2008; (2) the victim called 911 for the purpose of seeking police assistance to safely resolve that emergency; and (3) the emergency situation was not fully resolved prior to the end of the 911 call. In light of these facts, the trial court did not err in determinating that the victim's 911 call was non-testimonial in nature and could be admitted consistent with the Confrontation Clause. The defendant's claim that the trial court erred by denying her motion *in limine* and overruling her trial objection to the admission of the tape of the victim's 911 call is denied.

## VII.

The defendant claims that the trial court erred by failing to grant a mistrial after one witness testified that an acquaintance told him that the defendant murdered the victim. More specifically, during its case-in-chief the State asked Mr. Rick Greene, "how did you find out about [the victim's] death," to which the witness replied, "a mutual acquaintance of mine and [the defendant] called me at work" and asked "did you see the news?" The witness went on to testify that when he replied "no," the acquaintance "said [the defendant] killed her husband." Defense counsel immediately moved for a mistrial, but the trial court denied the motion and instead gave the jury a curative instruction, instructing them to disregard the statement. The defendant claims that notwithstanding this instruction, "the statement was so highly prejudicial to [the defendant] that it could only have improperly prejudiced the jury." We can discern no such prejudice.

The Tennessee Supreme Court succinctly summarized the relevant law concerning this claim and the pertinent standard of review in *Banks*:

> The decision of whether to grant or deny a mistrial rests within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). A mistrial should be declared only upon a showing of manifest necessity. *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003). Accordingly, a mistrial is

-35-

an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. *State v. Robinson*, 146 S.W.3d at 494. An appellate court should not reverse a trial court's decision denying a request for a mistrial absent a clear showing that the trial court abused its discretion. *State v. Reid*, 91 S.W.3d at 279. The burden of establishing the necessity of a mistrial lies with the party seeking it. *State v. Reid*, 164 S.W.3d at 342.

*Banks*, 271 S.W.3d at 137. We do not believe the trial court abused its discretion when it determined that the defendant's trial could continue without causing a miscarriage of justice.

The defendant asserts that the witness's testimony "implied the acquaintance had first-hand knowledge about the crime that she shared with him." To the contrary, the witness's testimony was that the statement made by the acquaintance indicating the defendant's guilt was made immediately after the acquaintance had asked the witness if he had seen the news. The logical conclusion to be drawn from this testimony was that the acquaintance's knowledge of the relevant events, and belief in the defendant's guilt, were drawn exclusively from what the acquaintance had seen on the news. That the defendant had previously been publicly accused of the victim's murder on television and other media could hardly have come as a shock to the jury, as they were partway through her trial, sitting on her very case, and listening to the State present its case against her when the statement was made. On this record and in this context, we can see no reasonable possibility that the defendant's jury was prejudiced by hearing a witness discuss what an acquaintance had seen on the news.

Even had the statement at issue posed some risk of prejudice, the judge promptly issued a curative instruction, and "[j]uries are presumed to follow the trial court's instructions." *Id.* The instruction given by the trial court adequately addressed any concern that the witness's statement might be relied upon by the jury to the defendant's prejudice. We cannot conclude that the trial court abused its discretion by concluding that the defendant failed to met her burden to establish that any continuation of the trial would cause a miscarriage of justice. The defendant's claim is denied.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE